**ORAL ARGUMENT NOT YET SCHEDULED**

Case Nos. 23-1111; 23-1335 (consolidated)

I~N THE~

# United States Court of Appeals
# for the District of Columbia Circuit

————————————

ENTERGY ARKANSAS, LLC,

Petitioner.

v.

THE FEDERAL ENERGY REGULATORY COMMISSION

Respondent.

————————————

On Petition for Review of a Final Order of the Federal Energy Regulatory Commission

————————————

**INITIAL BRIEF FOR INTERVENORS IN SUPPORT OF PETITIONER**

————————————

W~ILLIAM~ D. B~OOTH~
G~ARY~ M. B~RIDGENS~
A~LEX~. L. P~ETERSON~
M~ICHAEL~ B~EST~ & F~RIEDRICH~ LLP
1000 Maine Ave. SW, Suite 400
Washington, D.C. 20024
wdbooth@michaelbest.com
(202) 747-9560

*Counsel for the Mississippi Public Service Commission*

N~OEL~ D~ARCE~
S~TONE~ P~IGMAN~ W~ALTHER~ W~ITTMAN~
909 Poydras St., Suite 3150
New Orleans, LA 70112
ndarce@stonepigman.com
(504) 581-3200

*Counsel for the Louisiana Public Service Commission*

(*Additional Counsel Listed on Inside Cover*)

**August 11, 2023**

GLEN L. ORTMAN
DENNIS LANE
M. DENYSE ZOSA
STINSON LLP
1775 Pennsylvania Ave NW, #800
Washington, D.C. 20006
glen.ortman@stinson.com
(202) 572-9906

*Counsel for the Arkansas Public
Service Commission*

F. ALVIN TAYLOR, JR.
MCCARTER & ENGLISH LLP
1031 K St. NW, Suite 1000 W
Washington, D.C. 20005
ataylor@mccarter.com
(202) 753-3421

*Counsel for the East Texas
Electric Cooperative*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

### A. Parties

Counsel certifies that the Petitioners in this proceeding are Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, and Entergy Texas, Inc.

The Respondent is the United States Federal Energy Regulatory Commission ("FERC" or the "Commission").

The following parties have intervened in Case No. 22-1335: the Louisiana Public Service Commission ("Louisiana Commission"), the Mississippi Public Service Commission ("Mississippi Commission"), the Arkansas Public Service Commission ("Arkansas Commission"), the East Texas Electric Cooperative, Inc. ("East Texas") (together, the "Intervenors"), the Midcontinent Independent System Operator, Inc. ("MISO"), and the Council of the City of New Orleans (withdrawn).

### B. Rulings Under Review

Petitioners seek review of the Commission decisions:

1. *Midcontinent Independent System Operator, Inc.*, Order Accepting Proposed Tariff Revisions Subject to Condition, Docket Nos. ER22-495-000 and ER22-495-001, 180 FERC ¶ 61,141 (Aug. 31, 2022), R. 116, JA__.

2.  *Midcontinent Independent System Operator, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. ER22-495-003, 181 FERC ¶ 62,079 (Oct. 31, 2022), R. 130, JA__.

3.  *Midcontinent Independent System Operator, Inc.*, Order Addressing Arguments Raised on Rehearing and on Compliance, Docket Nos. ER22-495-002 and ER22-495-003, 182 FERC ¶ 61, 096 (Feb. 16, 2023), R. 132, JA___.

## C. Related Cases

This matter has not previously been before this Court or any other court, and there are no related cases, as that term is defined in Circuit Rule 28(a)(1)(C), currently before this Court or any other court.

Respectfully submitted,

/s/ Gary M. Bridgens

Gary M. Bridgens

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the Mississippi Commission, the Louisiana Commission, and the Arkansas Commission are each a governmental agency organized under their respective state laws and thus no corporate disclosure statement is required for these entities.

East Texas is a not-for-profit generation and transmission electric cooperative corporation organized under the laws of the State of Texas. As of January 1, 2018, East Texas has one generation and transmission cooperative member and seven distribution cooperative members. East Texas has no parent corporation, nor does any publicly held corporation own 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... vi

GLOSSARY OF ABBREVIATIONS ...................................................... viii

STATUTES AND REGULATIONS ......................................................... ix

STATEMENT OF THE CASE...................................................................1

   A.  MISO's Operating Margin Calculation ..........................................1

   B.  MISO's Offline Resource Capacity Accreditation............................2

SUMMARY OF ARGUMENT ..................................................................4

ARGUMENT ............................................................................................6

   A.  FERC's Acceptance of Design Flaws In MISO's Seasonal Resource
   Adequacy Construct Was Arbitrary And Capricious. ............................6

     1.  FERC's Acceptance Of MISO's Inclusion Of Offline Resources With a 12-
     Hour-or-Less Lead Time In The Operating Margin Calculation Was Arbitrary
     And Capricious. ...............................................................................7

       i.  FERC Did Not Adequately Explain How The 12-Hour Lead Time
       Standard For Offline Resources Is Rationally Connected To Resource
       Adequacy. ...................................................................................7

       ii.  FERC Deviated From Its Precedent Without Adequate Explanation By
       Accepting MISO's 12-Hour Lead Time For Offline Resources......................9

       iii.  FERC Failed To Respond To The Substantive Concerns Raised By
       Protesters And The Dissent. .........................................................10

     2.  FERC's Acceptance Of MISO's Accreditation Of Offline Resources With
     a 24-Hour Lead Time During Resource Adequacy Hours Was Internally
     Inconsistent And Therefore Arbitrary And Capricious. ...................................12

     3.  FERC's Failure To Support The Seasonal Construct Accreditation And 31-
     Day Outage Rule With Reasoned Decision Making Unreasonably Penalizes
     Retail Ratepayers Without Increasing Reliability And Is Arbitrary and
     Capricious. .....................................................................................14

   B.  FERC Failed To Explain Its Departure From Precedent And Adequately
   Address Reasonable Protests To MISO's Proposed Transition Period...............18

iv

1. FERC Declined To Address Reasonable Protests To The Transition Period. 18

2. FERC Failed To Adequately Explain Its Departure from Precedent..........21

CONCLUSION .......................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Am. Gas Ass'n v. FERC*, 593 F.3d 14 (D.C. Cir. 2010)............................................11

*ANR Pipeline Co. v. FERC*, 71 F.3d 897 (D.C. Cir. 1995) .......................................9

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir 2018) ..................................12

*Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022)............... 10, 21

*BG&E v. FERC*, 954 F.3d 279 (D.C. Cir 2020) .....................................................22

*Birckhead v. FERC*, 925 F.3d 510 (D.C. Cir. 2019)................................................21

*FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016), *rev'd,* Jan. 28, 2016 ... 14, 15

*Mich. Consol. Gas Co. v. Fed. Power Comm'n*, 283 F.2d 204 (D.C. Cir. 1960)....19

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore et al.*, 487 U.S. 354 (1988) ...................................................................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................................................... 15, 16

*New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202 (D.C. Cir. 2018) ...................................................................................................................10

*Nw. Corp. v. FERC*, 884 F.3d 1176 (D.C. Cir. 2018) .............................................12

*Scenic Hudson Preservation Conf. v. Fed. Power Comm'n*, 354 F.2d 608 (2d Cir. 1965) ...................................................................................................................19

*Sierra Club v. EPA*, 884 F.3d 1185 (D.C. Cir. 2018)..............................................12

*Time Warner Ent. Co., LP v. FCC*, 240 F.3d 1126 (2001)...................................7, 22

*United Airlines, Inc. v. FERC*, 827 F.3d 122 (D.C. Cir. 2016) ...........................7, 21

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) ...........................................................................................................7, 21

**Statutes**

16 U.S.C. § 824 (2018) ............................................................................14

**Other Authorities**

Corrected General Order, *In re: Development and Implementation of Rule for Integrated Resource Planning for Electric Utilities*, La. Pub. Serv. Comm'n, Docket No. R-30021 (Mar. 21, 2012)....................................................17

General Order, *In re: Possible Suspension of, Amendments to, the Commission's General Order Dated November 3, 2006 (Market Based Mechanisms Order) to Make the Process More Efficient and to Consider Allowing the Use of On0Line Auctions for Competitive Procurement*, La. Pub. Serv. Comm'n, Docket No. R-26172, Subdocket C (Oct. 29, 2008) ..................................................18

**Agency Proceedings**

*Midcontinent Indep. Sys. Op., Inc.*, 180 FERC ¶ 61,141 (2022) . 1, 2, 3, 4, 8, 11, 13, 16, 17, 20, 21, 22, 23

*Midcontinent Indep. Sys. Op., Inc.*, 182 FERC ¶ 60,096 (2022) .... 2, 4, 9, 13, 23, 24

*PJM Interconnection, L.L.C.*, 180 FERC ¶ 61,089 (2022)........................................9

*PJM Interconnection, LLC*, 117 FERC ¶ 61,331 (2006)........................... 22, 24, 25

*PJM Interconnection, LLC*, 151 FERC ¶ 61,208 (2015).................................. 22, 25

## <u>GLOSSARY OF ABBREVIATIONS</u>

<u>SHORT FORM</u>                                     <u>DEFINITION</u>

FERC                                               Federal Energy Regulatory
                                                   Commission


MISO                                               Midcontinent Independent
                                                   System Operator, Inc.


Seasonal Construct                                 Seasonal Resource Adequacy
                                                   Construct

## <u>STATUTES AND REGULATIONS</u>

Except for the following, all applicable statutes, etc., are contained in the Addendum to the Initial Brief of Petitioners the Entergy Operating Companies.

**<u>Federal Power Act, 16 U.S.C. § 824 (2018).</u>**

**(a) Federal regulation of transmission and sale of electric energy.** It is hereby declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this Part [16 USCS §§ 824 et seq.] and the Part next following [16 USCS §§ 825 et seq.] and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce.**

**(1)** The provisions of this Part [16 USCS §§ 824 et seq.] shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part [16 USCS §§ 824 et seq.] and the Part next following [16 USCS §§ 825 et seq.], over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

**(2)** Notwithstanding section 201(f) [subsec. (f) of this section], the provisions of sections 203(a)(2), 206(e), 210, 211, 211A, 212, 215A, 216, 217, 218, 219, 220, 221, and 222 [16 USCS §§ 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v] shall apply to the entities

ix

described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this Act [16 USCS §§ 791a et seq.] with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 203(a)(2), 206(e), 210, 211, 211A, 212, 215A, 216, 217, 218, 219, 220, 221, or 222 [16 USCS § 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v], shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce.** For the purpose of this Part [16 USCS §§ 824 et seq.], electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale".** The term "sale of electric energy at wholesale" when used in this Part [16 USCS §§ 824 et seq.] means a sale of electric energy to any person for resale.

**(e) "Public utility" defined.** The term "public utility" when used in this Part [16 USCS §§ 824 et seq.] or in the Part next following [16 USCS §§ 825 et seq.] means any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part [16 USCS §§ 824 et seq.] (other than facilities subject to such jurisdiction solely by reason of section 206(e), 206(f), 210, 211, 211A, 212, 215A, 216, 217, 218, 219, 220, 221, or 222 [16 USCS § 824e(e), 824e(f), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v]).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt.** No provision in this Part [16 USCS §§ 824 et seq.] shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

x

**(g) Books and records.**

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

   (A) an electric utility company subject to its regulatory authority under State law,

   (B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

   (C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A), wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—
   (A) preempt applicable State law concerning the provision of records and other information; or
   (B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005.

## STATEMENT OF THE CASE

The Intervenors hereby incorporate the Statement of the Case contained in the Initial Brief of Petitioners the Entergy Operating Companies ("Initial Brief of Petitioners"). The Intervenors provide the following supplemental facts to aid this Court in its review:

### A. MISO's Operating Margin Calculation

MISO defines its Resource Adequacy Hours as a "65-hour target that include all hours with declared MaxGen Events and the remaining hours with the tightest operating margin, subject to a maximum operating margin threshold of 25%." R. 116, *Midcontinent Indep. Sys. Op., Inc.*, 180 FERC ¶ 61,141 at P 92 (2022) ("Initial Order"), JA___. MISO's "operating margin" is its resource supply minus demand at any point in time. *See id.* (Clements, Comm'r, dissenting at P 12-13), JA___; R.83, Potomac Economics Comments at 8, JA___. MISO proposed to include offline resources with a 12-hour-or-less lead time in its operating margin calculation. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 92, JA___. MISO argued this 12-hour lead time was reasonable because it improved upon its initial proposal to include offline resources with a 24-hour lead time in its operating margin calculation. *Id.*, JA___. According to MISO, the 12-hour lead time would better reflect actual operating margins and lead to more Resource Adequacy Hours, leaving less need to fill-in deficient Resource Adequacy Hours when accrediting capacity. *Id.*, JA___.

1

Many stakeholders recommended a shorter lead time (two to six hours) as emergency conditions typically develop on short notice because of unforeseen events such as load forecast errors, wind forecast errors, and large unit forced outages. R.83, Potomac Economics Comments at 8-9, JA___; R.79, Clean Energy Coalition Comments at 11, JA___.

FERC acknowledged that a shorter lead time may be appropriate given that emergency conditions can quickly develop. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 255, JA___. However, FERC found MISO's 12-hour lead time just and reasonable, primarily because it improved upon MISO's initially proposed 24-hour lead time. *Id.*, JA___. On rehearing, FERC added that, as long as MISO's proposal led to Resource Adequacy Hours that reasonably reflect periods of system stress, MISO was not required to include as Resource Adequacy Hours those hours that would be tight but for the presence of offline resources with lead times between 6 and 12 hours. R. 132, *Midcontinent Indep. Sys. Op., Inc.*, 182 FERC ¶ 60,096 at P 45 (2022) ("Order on Rehearing"), JA___.

## B. MISO's Offline Resource Capacity Accreditation

After selecting its historically risky hours (*i.e.*, Resource Adequacy Hours) using its operating margin calculation, MISO will evaluate a resource's historic performance during these risky hours and assign it a capacity value. MISO proposed to accredit an offline resource that has up to a 24-hour lead time with its full capacity

output. R.116, Initial Order at P 140, 142, JA___. MISO argued its 24-hour lead time is reasonable because it reflects whether MISO could have committed the resource through its day-ahead market or other planning process. *See* R.83, Potomac Economics Comments at 10, JA___.

Stakeholders argued that offline resources with lead-times longer than 12 hours rarely contribute reliable capacity during emergency or tight operating conditions. *See, e.g.*, *id.* at 9-10, JA___. Because most reliability threats emerge during the operating day, MISO cannot commit an offline resource with a 24-hour lead time during these events. *Id.*, JA___. MISO recognized the uncertain availability of resources with a 12–24-hour lead time during tight conditions. R. 86, MISO Answer at 43, (acknowledging that historically most emergency events have been driven by events occurring after the Day-Ahead Market clears), JA___; R. 116, Initial Order, 180 FERC ¶ 61,141 at P 255 (FERC explaining that for MISO's operating margin calculation, "although [MISO] initially considered proposing a 24-hour lead time, it determined that, due to the operational concerns it faces, tight conditions are more likely to be identified 12 hours before a projected capacity shortfall than 24 hours ahead of time"), JA___.

Yet, FERC found MISO's 24-hour lead time proposal just and reasonable. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 276, JA___. It argued that, although tight conditions are more likely to be identified 12 hours beforehand than 24 hours

beforehand, some resource adequacy needs are identified 24 hours beforehand and a 24-hour lead time is appropriate for these instances. *Id.*, JA___. On rehearing, FERC found MISO reasonably used a 24-hour lead time for capacity accreditation—despite using a 12-hour lead time for its operating margin calculation—because MISO could reasonably predict operating issues and commit offline capacity resources 24-hours in advance. R. 132, Order on Rehearing, 182 FERC ¶ 60,096 at P 58, JA___.

## SUMMARY OF ARGUMENT

FERC's orders accepting MISO's Seasonal Resource Adequacy Construct ("Seasonal Construct") are arbitrary and capricious and should be vacated. The Commission erred because those orders (1) fail to link MISO's chosen design to specific resource adequacy needs, (2) inadequately address protesters' reasonable concerns, and (3) depart from precedent without explanation.

Regarding MISO's inclusion of offline resources with a 12-hour-or-less lead time in its operating margin calculation, FERC inadequately explained how the 12-hour lead time for offline resources is rationally connected to resource adequacy, despite many of those resources being unavailable in the moments that count. FERC's approval of the 12-hour-or-less methodology is inconsistent with its reasoning on other issues in MISO's proposal and deviates from its precedent

4

without adequate explanation. On this issue, FERC also failed to respond to substantive concerns of both protestors and the dissenting Commissioner.

FERC acted arbitrarily and capriciously by failing to provide a rational justification for its approval of the 31-day rule and for its conclusion that its Seasonal Construct methodology was a reasonable predictor of future availability. The 31-day rule intrudes upon state autonomy in generation planning by devaluing the contributions facilities in those states make to serving load and by penalizing generators for maintenance activities that were prudent, consistent with good utility practice, and that did not put reliability at risk. This rule discriminates against state-approved nuclear generation facilities—which are critical to serving capacity needs in MISO—for their reliance on efficient and prudent outage practices. FERC declined to address protests that the arbitrary 31-day rule does nothing to increase reliability and will impose costs on customers by requiring unneeded replacement capacity or raising maintenance costs. In addition, the accepted Seasonal Construct methodology was not adequately supported because it accredits generating resources based on random factors that fail to predict future unit availability.

FERC similarly failed to respond to protestors' concerns about MISO's proposed implementation timeline. Among arguments to extend the implementation timeline, protestors emphasized that MISO's proposed use of historic data would punish generators for prudent decisions made under a previous accreditation regime

and create negative incentives. Protestors requested a one-year delay to allow generators time to adjust to the new framework. FERC declined to address these reasoned concerns. This response fell short of reasoned decision making.

Finally, FERC's approval of MISO's implementation timeline constitutes an unjustified deviation from precedent. The Commission previously accepted four-year and five-year implementation timelines for similar construct changes in a neighboring Regional Transmission Organization, the PJM Interconnection, LLC. These constructs were analogous in that they required generators to make substantial changes to receive appropriate capacity values. FERC did not specifically explain why MISO's proposal *required* a significantly shorter implementation period than FERC accepted for other Regional Transmission Organizations subject to the same transitional risk—an unexplained departure from precedent.

## **ARGUMENT**

### A. FERC's Acceptance Of Design Flaws In MISO's Seasonal Resource Adequacy Construct Was Arbitrary And Capricious.

In addition to the design flaws highlighted in the Initial Brief of Petitioners, Pet. Init. Br. at 33-49, JA___, FERC arbitrarily and capriciously accepted MISO's Seasonal Construct by failing to address the following: (1) inclusion of offline resources with a 12-hour-or-less lead time in the operating margin calculation and (2) accreditation of offline resources with a 24-Hour lead time during Resource Adequacy Hours.

1. **FERC's Acceptance Of MISO's Inclusion Of Offline Resources With a 12-Hour-or-Less Lead Time In The Operating Margin Calculation Was Arbitrary And Capricious.**

FERC's acceptance of MISO's inclusion of offline resources with a 12-hour-or-less lead time in its operating margin calculation was arbitrary and capricious for three reasons. First, FERC did not adequately explain how the 12-hour lead time is rationally connected to resource adequacy. Second, FERC deviated from its precedent without adequate explanation by approving MISO's 12-hour lead time. Third, FERC failed to respond to the substantive concerns of protesters and the dissent.

i. **FERC Did Not Adequately Explain How The 12-Hour Lead Time Standard For Offline Resources Is Rationally Connected To Resource Adequacy.**

FERC must articulate a rational connection between the facts found and the choices made; failing to do so means FERC's decision is arbitrary and capricious and must be vacated. *E.g., Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330–31 (D.C. Cir. 2021); *United Airlines, Inc. v. FERC*, 827 F.3d 122, 127 (D.C. Cir. 2016). FERC must adequately explain how a rule it approves accomplishes its stated purpose. *See Time Warner Ent. Co., LP v. FCC*, 240 F.3d 1126, 1137, 1144 (2001) (rejecting the FCC's decision for making "no effort" to link the chosen limits to the stated goals).

FERC found MISO's Seasonal Construct just and reasonable because it "assign[ed] resources a capacity value based on their historical performance during high-risk hours in each Season." R. 116, Initial Order at P 243, JA___.

The offline resources MISO included in its operating margin calculation were a critical aspect of its proposal to match capacity with high-risk hours. *See* R.83, Potomac Economics Comments at 8, ("The critical aspect of [the operating margin] determination is the designated lead time for offline units that will be used to calculate the margin."), JA___. MISO will select Resource Adequacy Hours based on operating margin during a given hour, and a resource's performance during these hours will account for 80% of its capacity accreditation. R.116, Initial Order at P 94, JA___.

However, FERC never explained why MISO's inclusion of offline resources with a 12-hour-or-less lead time when calculating operating margin would produce Resource Adequacy Hours that reasonably reflect the riskiest hours in MISO. FERC does not cite any evidence explaining that offline resources that may take up to 12 hours to supply electricity can timely respond to and be available for emergency or tight operating conditions within a few hours. In other words, a generator that takes 12 hours to start-up cannot respond to a shortage of generation that will happen in two hours. Because these resources are unlikely to be available so quickly, MISO's reliance on them as available resources will lead to the selection of Resource

8

Adequacy Hours that do not reflect the most significant periods of system stress. R.83, Potomac Economics Comments at 9 (explaining that "MISO may calculate a large margin and not designate an hour as an RA hour even though the hour is among the tightest of the year."), JA___.

Instead of relying on data, FERC argues that MISO's 12-hour lead time is just and reasonable because it clears the low bar MISO set for itself, improving upon its original 24-hour lead time proposal. However, as noted in Commissioner Clements dissent on rehearing, "$100 for a gallon of milk is not a fair price, and the fact that $50 is a better alternative does not make it reasonable." R. 132, Order on Rehearing, 182 FERC ¶ 60,096 (Clements, Comm'r, dissenting at P 5), JA___. The analogy applies clearly here: MISO's 12-hour lead time proposal is not just and reasonable simply because it could have been worse. FERC ignored record evidence that demonstrated the inadequacy of MISO's proposed 12-hour lead time.

### ii. FERC Deviated From Its Precedent Without Adequate Explanation By Accepting MISO's 12-Hour Lead Time For Offline Resources.

Where an agency departs from established precedent without a reasoned explanation, its decision must be vacated as arbitrary and capricious. *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995). A proposal is not just and reasonable merely because it is an improvement over another approach. *PJM Interconnection, L.L.C.*, 180 FERC ¶ 61,089 at P 47 (2022) ("PJM argues that

9

[Intelligent Reserve Deployment] is an improvement over the all-call approach, but, even if that characterization were true, that does not render this particular proposal to use the largest contingency in the [Intelligent Reserve Deployment] case just and reasonable.")

In violation of precedent, FERC accepted MISO's inclusion of offline resources with a 12-hour-or-less lead time in its operating margin calculation primarily because it improved upon MISO's internal consideration of a 24-hour lead time. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 255; Order on Rehearing, 182 FERC ¶ 60,096 at P 45, JA___. MISO's proposal is not just and reasonable merely because it cleared the low bar it set for itself. FERC did not acknowledge or attempt to explain its deviation from its recent precedent explaining that a Regional Transmission Organization's proposal is not just and reasonable merely because it improves upon another approach. *PJM Interconnection, L.L.C.*, 180 FERC ¶ 61,089 at P 47 (2022). As a result, FERC's decision should be vacated as arbitrary and capricious.

### iii. FERC Failed To Respond To The Substantive Concerns Raised By Protesters And The Dissent.

FERC must meaningfully respond to facially reasonable arguments raised before it. *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 184 (D.C. Cir. 2022); *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210–13 (D.C. Cir. 2018) (finding that FERC failed to meaningfully respond to arguments when its

10

responses "amounted to conclusory statements that dismissed Petitioners' concerns without providing reasoned analysis"). In this case, protestors and FERC Commissioner Clements raised reasonable concerns about the 12-hour lead time that the majority was obligated to consider and substantively address. *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 21 (D.C. Cir. 2010).

Specifically, Potomac Economics and the Clean Energy Coalition argued that, because emergency conditions typically develop with significantly less than a 12-hour notice, offline resources with a 6–12-hour lead time cannot respond. R. 83, Potomac Economics Comments at 9-10, JA___; R. 79, Clean Energy Coalition Comments at 11, JA___. By including these offline resources in its operating margin calculation, MISO will assume the availability of resources that will likely not be available and consequently choose the wrong hours as Resource Adequacy Hours. Commissioner Clements raised this issue in dissent. R. 116, Initial Order, 180 FERC ¶ 61,141 (Clements, Comm'r, dissenting at P 12-13), JA___. Rather than respond, the FERC majority ducked the issue by stating that the "issue before us is not whether a 2- or 6-hour lead time is preferable to a 12-hour lead time" but whether a 12-hour lead time is a reasonable input into a formula that calculates Resource Adequacy Hours which reasonably reflect periods of system stress. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 45, JA___. But, FERC never answers its own question, failing to explain why the 12-hour lead time is reasonable input

11

considering the concerns of protestors and the dissent. MISO's inclusion of resources that cannot respond to emergency conditions (*i.e.*, those with a 12-hour lead time) causes MISO to overestimate the amount of available capacity at that time and calculate inaccurate operating margins. As a result, Resource Adequacy Hours—which MISO selects based on operating margins and upon which MISO centers its entire capacity market—may not reasonably reflect the MISO's tightest hours. This will impact the Seasonal Construct accreditations. FERC's decision not to respond substantively to protests and the dissent renders its decision arbitrary and capricious.

   2.  **FERC's Acceptance Of MISO's Accreditation Of Offline Resources With a 24-Hour Lead Time During Resource Adequacy Hours Was Internally Inconsistent And Therefore Arbitrary And Capricious.**

   FERC's decisions must be "reasonable and reasonably explained." *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018). Where FERC's decision is internally inconsistent without an adequate explanation, it is arbitrary and capricious and not the product of reasoned decision making. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir 2018) (citing *Sierra Club v. EPA*, 884 F.3d 1185, 1194–96 (D.C. Cir. 2018)).

   The lead times MISO used for its operating margin calculation and for accrediting capacity address the same question: how quickly must an offline resource start up and generate electricity to be available during tight operating hours?

Yet, FERC accepted MISO's full accreditation of offline resources with a 24-hour lead time, despite accepting MISO's 12-hour operating margin lead time because 24-hours would less accurately predict resource availability. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 255, 275, JA___; R. 132, Order on Rehearing, 182 FERC ¶ 60,096 at P 45, 57-58, JA___.

FERC argued the longer 24-hour lead time is appropriate for accrediting capacity because MISO can forecast potential operating day issues multiple days in advance and commit offline resources with a 24-hour lead time in response to tight operating conditions. R. 132, Order on Rehearing, 182 FERC ¶ 60,096 at P 57-58, JA___. However, FERC offered no evidence that MISO's days-in-advance projections can precisely predict the tightest operating conditions. R. 132, Order on Rehearing, 182 FERC ¶ 60,096 (Clements, Comm'r, dissenting at P 13), JA___. MISO admitted that its highest risk hours are typically caused by short-notice events to which slow-starting offline resources cannot respond. R. 86, MISO Answer at 43, JA___. As Commissioner Clements noted in dissent, if FERC determined that resources with lead times between 12 and 24 hours are not relevant to determining MISO's periods of greatest stress (*i.e.,* operating margin), it is unclear how FERC can provide these resources with full capacity credit. R. 132, Order on Rehearing, 182 FERC ¶ 60,096 (Clements, Comm'r, dissenting at P 14 n. 29), JA___. FERC

13

did not answer Commissioner Clements' concern or reasonably explain its approval of MISO's inconsistent lead times.

> **3. FERC's Failure To Support The Seasonal Construct Accreditation And 31-Day Outage Rule With Reasoned Decision Making Unreasonably Penalizes Retail Ratepayers Without Increasing Reliability And Is Arbitrary and Capricious.**

Intervenors support the arguments raised in the Initial Brief of Petitioners regarding the 31-day replacement rule and accreditation under the Seasonal Construct. Pet. Init. Br. at 22, 33, JA___. The costs of any penalties imposed or additional generation capacity required will be assessed in large part to retail ratepayers. *See Mississippi Power & Light Co. v. Mississippi ex rel. Moore et al.*, 487 U.S. 354, 382-83 (1988) (Scalia, J., concurring). States have exclusive authority "over facilities used for the generation of electric energy." 16 U.S.C. § 824 (b)(1) (2018). The MISO Seasonal Construct proposal and 31-day rule intrude upon valid state generation decisions and planning by devaluing the contributions those facilities make to serving load during each hour of the year and by penalizing generators for maintenance activities that were prudent and that did not put reliability at risk. While FERC has the authority to regulate wholesale markets without regard to the impact its decisions have on retail rates, state and federal authority are complementary, and FERC actions impacting retail rates must not be arbitrary and capricious. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 289-91 (2016), *rev'd*, Jan. 28, 2016. The agency must "examine[] the relevant [considerations] and

14

articulate[] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, FERC's decision falls far short of that standard.

Under the new MISO Seasonal Construct, if a generator has a planned outage that exceeds 31 days during a season when the resource is committed, MISO will require a resource owner to acquire replacement capacity in the form of Zonal Resource Credits or impose a charge for failure to replace those credits. R. 2, MISO Tariff Filing (Direct Testimony of Shawn McFarlane at 37), JA ___.

Nuclear units are an important part of the generation needed to serve load in MISO, especially in the southern states participating in MISO. For the year spanning November 2020 to November 2021, nuclear generation constituted 15.6 to 16.9 percent of MISO's real time generation fuel mix, and an even greater percentage in MISO South. R. 53, Louisiana Commission Protest at 3, JA___. Nuclear refueling outages typically occur every 18 to 24 months (when spent nuclear fuel is replaced with new fuel) and are usually scheduled in shoulder months (fall and spring) when electricity demand is lower. *Id.* at 3-4, JA___. Because it limits the operational cycling of equipment and reduces personnel exposure to radiation, routine nuclear plant maintenance (*e.g.*, upgrades, repairs, and preventive maintenance) is typically scheduled to occur during refueling outages. As a consequence, despite significant

15

improvements in the outage optimization during the last two decades, the average nuclear refueling outage lasts more than 31 days. *Id.* at 4 n.7, JA___.

FERC provided no justification for accepting the 31-day rule. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 339, JA___. As such, it is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 51-52 (describing that an agency must engage in reasoned decision making, weigh competing views, and intelligibly explain the reasons for making its decision with adequate support from the record). MISO's 31-day rule discriminates against large nuclear generators, does nothing to increase reliability, and will impose costs on customers by requiring unneeded replacement capacity or by raising the costs of necessary maintenance.

FERC's approval of the Seasonal Construct proposal was arbitrary and capricious and not the result of reasoned decision making. There was no reasoned support for FERCs finding that the Seasonal Construct methodology was a predictor of future generator availability. MISO's proposed accreditation framework focuses upon too small a sampling of historic hours, and too few historic years, to provide a meaningful representation of 80 percent of a unit's capacity credit. The MISO proposal will penalize units that happened to be unavailable on random, historic, and resource-tight days, regardless of whether those units were needed to serve customers or provide reserves on those days. Similarly situated units that were unavailable at other hours (which happened not to be among those hours selected by

16

MISO) will not be penalized. The conduct of both sets of units was no different; the only differences are the hours selected and the random timing of the arrival of an extreme cold front, other adverse weather event, or simply the calculation of the 65 tightest hours of a season (or several seasons) that had no reliability issues at all.

FERC's justification for approval of the Seasonal Construct proposal and for finding that its results were not random came solely from a MISO deficiency letter response in which MISO hand-selected a very small sample from each MISO North and MISO South. R. 97, MISO Deficiency Letter Response at 7 (Question 4), JA__; R. 116, Initial Order, 180 FERC ¶ 61,141 at P 246, JA___. That sample size was even smaller than the inadequate Seasonal Construct sample size. It was too small of a sample to be meaningful, and it did not look at the historic performance of individual units—the only issue that mattered. The Commission's acceptance of MISO's Seasonal Construct proposal was arbitrary and capricious, and not based on reasoned decision making.

State regulators require utilities within their jurisdiction to plan adequate capacity and to select the type of capacity needed through integrated resource planning and a certification process. These processes consider needs, costs, and reliability through a carefully required analysis. *See, e.g.*, Corrected General Order, *In re: Development and Implementation of Rule for Integrated Resource Planning for Electric Utilities*, La. Pub. Serv. Comm'n, Docket No. R-30021 (Mar. 21, 2012);

17

General Order, *In re: Possible Suspension of, Amendments to, the Commission's General Order Dated November 3, 2006 (Market Based Mechanisms Order) to Make the Process More Efficient and to Consider Allowing the Use of On0Line Auctions for Competitive Procurement*, La. Pub. Serv. Comm'n, Docket No. R-26172, Subdocket C (Oct. 29, 2008). These processes and approvals take into account that down time for scheduled maintenance is required, and inefficient maintenance practices have the potential to greatly increase costs. FERC's acceptance of the MISO 31-day rule and Seasonal Construct accreditation will interfere with the state planning decisions described herein and increase maintenance costs, without increasing reliability.

### B. FERC Failed To Explain Its Departure From Precedent And Adequately Address Reasonable Protests To MISO's Proposed Transition Period.

The Commission failed to meaningfully protect public interests by (1) ignoring concerns regarding MISO's proposed transition period and (2) failing to rationally explain its inconsistent treatment of the implementation timelines here and in previous analogous cases. Failure to explicitly address these concerns renders its decision arbitrary and capricious.

### 1. FERC Declined To Address Reasonable Protests To The Transition Period.

The Commission's role as a representative of the public interest "does not permit it to act as an umpire blandly calling balls and strikes for adversaries

appearing before it[] . . . ." *Scenic Hudson Preservation Conf. v. Fed. Power Comm'n*, 354 F.2d 608, 620 (2d Cir. 1965). Rather, "the right of the public must receive active and affirmative protection at the hands of the Commission." *Id.* To this end, "the Commission has an affirmative duty to inquire into and consider all relevant facts." *Id.* When a regulatory agency ignores factors relevant to the public interest, "the scope of judicial review is sufficiently broad to order their consideration." *Id.* at 621 (citing *Mich. Consol. Gas Co. v. Fed. Power Comm'n*, 283 F.2d 204, 224 (D.C. Cir. 1960)).

The Commission failed to respond meaningfully to repeated warnings that MISO's proposal would punish generators for decisions prudently made under the previous accreditation regime. *See, e.g.*, R. 63, Consumers Energy Limited Protest at 1-2, JA___; R. 72, MISO Transmission Owners Comments at 5-6, JA___; R. 71, E. Tex. Elec. Coop. Protest at 9, JA___; R. 77, DTE Electric Protest at 15, JA___; R. 51, Alliant Energy Corporate Services, Inc. Protest at 7, JA___. The proposed accreditation would be applied to operational choices (*e.g.*, historical real-time energy offers, outages, and notification times) that were prudent when made. R. 63, Consumers Energy Limited Protest at 1-2, JA___. "Using historical performance for a resource that did not—and could not—respond to these newly implemented incentives is improper and could detrimentally impact future accreditation for these resources." R. 77, DTE Electric Protest at 15, JA___. Such a policy leaves resource

19

owners and operators without an effective means to mitigate the risks of MISO's new standards and imposes unnecessary risk on resources. *See* R. 71, East Texas Protest at 9, JA___.

Stakeholders protested the use of historical data in MISO's proposal, requesting that FERC "more thoroughly examine MISO's support for these changes because, if the details of MISO's proposal are incorrect, the potential for . . . negative consequences is significant."[1] R. 51, Alliant Energy Corporate Services, Inc. Protest at 7, JA___. Stakeholders asked the Commission to delay MISO's implementation to allow generators to adjust operations and outage scheduling accordingly; others sought more extensive studies on the underlying data before implementation. *Id.*, JA___; R. 116, Initial Order, 180 FERC ¶ 61,141 at P 139, JA___.

FERC dismissed these concerns without explanation. FERC was "unpersuaded by arguments that MISO's proposal would unduly harm resources owners because of their past operational decisions." R. 116, Initial Order, 180 FERC ¶ 61,141 at P 248, JA___. FERC rationalized that the proposal timeline was not harmful (*i.e.*, too short) because (1) MISO filed its proposal 16 months ahead of the 2023/2024 Auction, (2) the proposal includes a three-year phase-in, (3) the three-

---

[1] MISO's internal market monitor, Potomac Economics, elsewhere noted that as uncertainties on the system grow, the adverse effects of MISO's proposal are likely to increase. R. 83, Potomac Economics Comments at 9, JA___.

year rolling average used to calculate Intermediate Seasonal Accredited Capacity values mitigates the impact of any one season, (4) resources with outages prior to a certain date are exempt from certain hours, and (5) resources should already have an expectation to be offering capacity into MISO markets. *Id.*, JA___.

None of these responses directly address concerns regarding the use of historical data in this new and novel accreditation approach; specifically, that generators who consistently operated and maintained resources in accordance with good utility practice and procedures, and in compliance with MISO's existing tariff, should not suddenly experience a reduction in capacity values that could subject utilities and their retail customers to significant financial penalties. FERC failed to "examine the relevant data and articulate[] a satisfactory explanation for its action, including a rational connection between the facts found and the choices made." *Vecinos para el Bienestar de la Comunidad Costera*, 6 F.4th at 1328 (quoting *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019)); *see also, e.g.*, *Belmont Mun. Light*, 38 F.4th at 184 ("It is well established that the Commission must respond meaningfully to the arguments raised before it."); *United Airlines*, 827 F.3d at 127.

**2.  FERC Failed To Adequately Explain Its Departure from Precedent.**

The Commission failed to rationally explain its inconsistent treatment of the implementation timelines between this case and similar cases involving PJM

Interconnection, L.L.C., and failed to link emergency event frequency with MISO's implementation timeline. The Administrative Procedure Act's reasoned-decision-making requirement dictates that "the duty to explain inconsistent treatment is incumbent on the agency." *BG&E v. FERC*, 954 F.3d 279, 285 (D.C. Cir 2020). That explanation must attempt to link the choice made to the stated goal of the proposal. *See Time Warner*, 240 F.3d at 1137, 1144 (rejecting the FCC's decision for making "no effort" to link its choices to the stated goals).

Protestors opposed MISO's proposed implementation timeline because FERC previously accepted longer transition periods for establishing new capacity markets and for making significant changes in capacity markets. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 111, JA___. Specifically, the Commission accepted a four-year transition period when establishing PJM's Reliability Pricing Model because "it allows the participants in the market a period of time to understand and get used to the dynamics of the new capacity market prior to its full implementation." *PJM Interconnection, LLC*, 117 FERC ¶ 61,331 at P 68 (2006) ("PJM Reliability Pricing Model Order"). And the Commission accepted a five-year transition period in its PJM Capacity Performance Order because that period would allow resources to make the necessary improvements and mitigate adverse impacts resultant from the significant change in requirements. *PJM Interconnection, LLC*, 151 FERC ¶ 61,208 at P 253 (2015) ("PJM Capacity Performance Resource Order").

22

Here, FERC rejects a comparable transition mechanism because, in its view, MISO's proposal amounts to a simple modification of its capacity market, rather than the creation of a new one. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 249, JA___. FERC notes that resources already have an expectation of needing to be available and therefore, it is reasonable for resources to have a shorter transition period. *Id.*, JA___. In its Order on Rehearing, the Commission stated that it would maintain the three-year implementation period because MISO demonstrated a high degree of urgency to improve its resource adequacy construct, as illustrated by the increasing number of system emergencies and certain insufficient reserves. R. 132, Order on Rehearing, 182 FERC ¶ 60,096 at P 73, JA___.

FERC's decision not to require a reasonable transition period as it did in previous orders denies MISO market participants and customers the same necessary protections from the same significant risks experienced in PJM Interconnection, LLC. The Commission accepted a longer transition period for PJM Interconnection, LLC's resource adequacy construct revisions because the market participants in those cases required additional time to become familiar with the market design and to make the necessary improvements that would mitigate impacts from the change. R. 116, Initial Order, 180 FERC ¶ 61,141 at P 249, JA___. FERC did not explain why a three-year transition period—as opposed to any other duration—sufficiently

23

justifies exposing MISO customers to the same risks from which PJM customers received protection.

The Commission's differentiation of its PJM precedent overlooks material facts and fails to justify the need for a shortened implementation timeline. Like MISO, PJM cited growing reliability concerns as the driver for its Reliability Pricing Model. *PJM Reliability Pricing Model Order*, 117 FERC ¶ 61,331 at P 2 (2006). And the Commission incorrectly cites MISO's May 20, 2022, Answer and Mr. Scott Wright's testimony as support for its conclusion that the proposed implementation timeline is necessary. R. 132, Order on Rehearing, 182 FERC ¶ 60,096 at P 72, JA___. Neither MISO's Answer nor Mr. Wright's testimony explicitly state why a three-year transition period is critical to effecting MISO's stated goal of increasing reliability. The record contains no support for the notion that a four-year (or longer) implementation period would foil MISO's reliability goals. Rather, MISO would have this Court, in effect, give Regional Transmission Organizations full autonomy to determine the implementation timelines for novel accreditation constructs, no matter how overwhelming the stakeholder opposition. *See* R. 56, Mississippi Commission and Mississippi Public Utilities Staff Protest at 8-29, JA___ (describing stakeholders' repeated efforts to delay implementation of MISO's Seasonal Construct).

24

FERC's inconstancy is further demonstrated by its view on the novelty of MISO's construct. Even though MISO proposes to fundamentally alter the way generators plan, produce, and sell power, the Commission downplays the novelty of MISO's proposal. Stakeholders under PJM's Reliability Pricing Model were allowed four years to adjust to PJM's proposal, despite the case involving neither a novel seasonal pricing construct nor equally extensive stakeholder opposition. *PJM Reliability Pricing Model Order*, 117 FERC ¶ 61,331 at P 29 (2006). Further, PJM's Capacity Performance Resource Model, which was implemented over a five-year period, was essentially identical to one deployed by the Independent System Operator-New England, but the Commission there determined that market participants should benefit from a longer implementation timeframe. *PJM Capacity Performance Resource Order*, 151 FERC ¶ 61,208 at P 12 (2015). MISO's construct is at least as novel as the PJM constructs accepted by FERC, and the Commission failed to adequately justify why the departure from its precedent is necessary to meet MISO's stated goals.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse and remand FERC's orders.

Respectfully submitted this 11th day of August 2023,

/s/William Booth_____

William D. Booth
Gary M. Bridgens
Alex. L. Peterson
Michael Best & Friedrich LLP
1000 Maine Ave. SW, Suite 400
Washington, D.C. 20024
wdbooth@michaelbest.com
gmbridgens@michaelbest.com
alpeterson@michaelbest.com
(202) 747-9560

*Counsel for the Mississippi Public
Service Commission*

/s/Noel Darce_____

 Noel Darce
Stone Pigman Walther Wittman
909 Poydras St., Suite 3150
New Orleans, LA 70112
(504) 581-3200
ndarce@stonepigman.com

*Counsel for the Louisiana Public
Service Commission*

/s/Glen L. Ortman_____

Glen L. Ortman
Dennis Lane
M. Denyse Zosa
Stinson LLP
1775 Pennsylvania Ave NW, #800
Washington, D.C. 20006
glen.ortman@stinson.com
dennis.lane@stinson.com
denyse.zosa@stinson.com
(202) 572-9906

*Counsel for the Arkansas Public
Service Commission*

/s/F. Alvin Taylor, Jr._____

F. Alvin Taylor, Jr.
McCarter & English LLP
1031 K St. NW, Suite 1000 W
Washington, D.C. 20005
ataylor@mccarter.com
(202) 753-3421

*Counsel for the East Texas
Electric Cooperative*

26

**Certificate of Compliance with Type-Volume Limitation,
<u>Typeface Requirements and Type Style Requirements</u>**

1. This brief complies with the type-volume limitation of D.C. Cir. R. 32(E)(2)(B)(ii), as well as the Court's Scheduling Order entered on May 30, 2023, because this brief contains 5,739 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Times New Roman 14-point typeface.

/s/ Gary M. Bridgens

Gary M. Bridgens
Michael Best & Friedrich LLP
1000 Maine Ave. SW, Suite 400
Washington, DC 20024
(202) 844-3809
gmbridgens@michaelbest.com

*Attorney for the Mississippi Public
Service Commission*

Dated: August 11, 2023.

27

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Fed. R. App. P. 25(d) and Circuit Rule 25(c), I hereby certify that I have caused the foregoing documents to be served upon all parties or on their counsel of record through the Court's CM/ECF system on the 11th day of August 2023.

<u>/s/ Gary M. Bridgens</u>

Gary M. Bridgens